UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LIANNA THOMAIDIS,

                              Plaintiff,

                                                          **MEMORANDUM**
            v.                                            **AND ORDER**
                                                          23-CV-4242-SJB-SIL

WELTHAM LLC, et al.,

                              Defendants.
------------------------------------------------------------------X
**BULSARA, United States District Judge:**

Defendants Weltham LLC and Weltham Capital, Inc. (collectively, "Defendants") have moved for summary judgment on Plaintiff Lianna Thomaidis's Complaint alleging discrimination and retaliation under Title VII and the New York State Human Rights Law ("NYSHRL"), as well as breach of contract. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. dated Apr. 10, 2025 ("Defs.' Mot."), Dkt. No. 49-1; Pl.'s Mem. in Opp'n to Defs.' Mot. dated May 9, 2025 ("Pl.'s Opp'n), Dkt. No. 49-8; Defs.' Reply Mem. in Further Supp. of Defs.' Mot. dated June 11, 2025 ("Defs.' Reply"), Dkt. No. 49-10). Thomaidis alleges that she was fired after she informed Defendants that she was pregnant and sought information about maternity leave. Defendants seek dismissal largely on the grounds that Thomaidis was not hired, employed, or fired by them, but by a related entity. Because material fact questions remain about which entity employed and took the allegedly adverse action against Thomaidis, the motion is denied.

STANDARD FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth

2

purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot — as is true for the summary judgment motion as a whole — weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary

judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted.

Thomaidis filed her Complaint on June 8, 2023, bringing claims for discrimination under Title VII, (Compl., Dkt. No. 1 ¶¶ 73–77), retaliation under Title VII, (*id.* ¶¶ 78–80), discrimination under the NYSHRL, (*id.* ¶¶ 81–83), retaliation under the NYSHRL, (*id.* ¶¶ 84–86), and breach of contract, (*id.* ¶¶ 87–91).[1]  The Complaint names Weltham LLC, Weltham Capital, Inc. ("Weltham Capital"), and Sammy Abdalla[2] as Defendants.

There are four corporate entities in the orbit of this case.  The first is Defendant Weltham LLC, a California-based company that invests in businesses including car washes and real estate.  (Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), Dkt. No. 49 ¶ 3; Pl.'s Resp. to Defs.' 56.1 Stmt. ("Pl.'s 56.1 Stmt."), Dkt. No. 49-6 ¶ 3).  Weltham LLC has two shareholders/members, Imran Dadabhoy and Naveed Siddiqui.  (*Id.* ¶ 4; Defs.' 56.1 Stmt. ¶ 4).  Second is Defendant Weltham Capital, a California corporation owned by Weltham LLC, and formed to engage in real estate transactions.  (*Id.* ¶ 5; Pl.'s 56.1 Stmt. ¶ 5).  Third is Avolar LLC, a New York company that Abdalla owns, which is not a

---

[1] The case was reassigned from the Honorable Eric N. Vitaliano to the undersigned on January 7, 2025.

[2] Abdalla has not appeared, and the Clerk of Court entered default against him on November 7, 2023.  (Dkt. No. 26).

party to this case.  (*Id.* ¶ 6; Defs.' 56.1 Stmt. ¶ 6).  And finally, there is a Delaware

company, Weltham Capital LLC ("Weltham Delaware"), that was formed as a joint-

venture agreement between some combination of the first three entities after Thomaidis

was hired.[3]  (*Id.* ¶¶ 6, 10; Pl.'s 56.1 Stmt. ¶¶ 6, 10).

The material facts relevant to this case are almost entirely in dispute, and can be

summarized in two categories: (1) which entity employed, and by extension, terminated

Thomaidis, and (2) why she was terminated.

As to which entity employed and fired Thomaidis, Defendants assert that

Abdalla alone ran Weltham Capital and Weltham Delaware, and that Weltham LLC

was just an investor in Weltham Capital.  (Defs.' 56.1 Stmt. ¶¶ 8, 19, 21).  They contend

that Abdalla hired Thomaidis to work for Weltham Capital around April 21, 2021, with

the understanding that she would work for Weltham Delaware when it was up and

running.  (*Id.* ¶¶ 9, 11).  Ultimately, Defendants contend that Thomaidis worked for

Weltham Delaware during the alleged discrimination, and that she was never

employed or paid by Weltham LLC, (*id.* ¶¶ 11–16), which should be dismissed.

Thomaidis, on the other hand, claims that she was hired by Abdalla "in

conjunction with Dadabhoy and Siddiqui" to work for both Weltham LLC and

Weltham Capital.  (Pl.'s 56.1 Stmt. ¶¶ 9, 11–16).  She claims that Abdalla, Dadabhoy,

and Siddiqui ran all three Weltham entities, and that she took regular direction from all

three of them.  (*Id.* ¶¶ 8, 19, 21).  Although her offer letter only lists Weltham Capital,

---

[3] Defendants state that Weltham Capital and Avolar LLC formed Weltham Delaware, (Defs.' 56.1 Stmt. ¶ 6), but Thomaidis claims that the joint venture agreement is between Weltham Capital, Avolar LLC, and Weltham LLC, (Pl.'s 56.1 Stmt. ¶ 6).

Thomaidis asserts that both Weltham LLC and Weltham Capital employed her and paid her salary.  (*Id.* ¶ 16).

As for the circumstances surrounding the end of her employment, Defendants claim that Abdalla alone terminated Thomaidis on May 27, 2022,[4] without consulting or informing Weltham LLC, or Siddiqui or Dadabhoy.  (Defs.' 56.1 Stmt. ¶ 23).  Defendants also contend they understood she was terminated for financial reasons: a change in market conditions led to financial concerns for Weltham Capital and Weltham Delaware, and both entities shut down after her termination — Weltham Capital was closed by January 2023.  (*Id.* ¶¶ 24–29).  Thomaidis disputes these characterizations. She says that Abdalla communicated with Siddiqui and Dadabhoy about her requests for maternity leave, including through email on the date on which she was terminated, and that she was terminated because of her gender and pregnancy — not out of financial considerations.  (Pl.'s 56.1 Stmt. ¶¶ 23, 27–28).

---

[4] There is some disagreement about when exactly Defendants were aware Thomaidis was pregnant.  Thomaidis says that Abdalla was aware of her pregnancy around January 2022, and that she informed Dadabhoy she was pregnant between February and March 2022.  (Pl.'s 56.1 Stmt. ¶ 22).  She contends that all three — Abdalla, Siddiqui, and Dadabhoy — were aware of her pregnancy by April 2022 at the latest. (*Id.*).  Defendants provide a different timeline.  They claim that "[t]he investors at Weltham LLC learned that Plaintiff was pregnant in or around May 2022."  (Defs.' 56.1 Stmt. ¶ 22).  "The investors" presumably refers to Siddiqui and Dadabhoy, the only "shareholders/members" of Weltham LLC.  (*Id.* ¶¶ 4, 22).  In any event, they knew Thomaidis was pregnant before her termination.  (Dep. of Imran Dadabhoy ("Dadabhoy Dep."), attached to Defs.' Reply as Ex. A, Dkt. No. 49-11 at 54:4-6 (confirming Dadabhoy knew by May 9, 2022)).

7

DISCUSSION

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[5] *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). Pregnancy discrimination is a form of sex discrimination. *Legg v. Ulster County*, 820 F.3d 67, 72 (2d Cir. 2016) (citing 42 U.S.C. § 2000e(k) (The Pregnancy Discrimination Act)). "When there is no direct evidence of discrimination, claims of age, sex, race and national origin discrimination (including associated claims of retaliation) under Title VII . . . and the New York State Human Rights Law . . . are each subject to the *McDonnell Douglas* burden-shifting analysis." *Hernandez v. Kwiat Eye & Laser Surgery, PLLC*, No. 23-7679, 2024 WL 5116365, at *1 (2d Cir. Dec. 16, 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that framework, a plaintiff "must first show that (1) she belonged to a protected class, (2) she was qualified for her job, (3) she was fired, and (4) her firing took place under circumstances giving rise to an inference of discriminatory intent." *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 48 (2d Cir. 2025) (quotation omitted). If she makes that prima facie showing, "a presumption of discriminatory intent arises, and the burden shifts to [defendants] to articulate a legitimate, non-discriminatory reason for firing her." *Id.* (quotation omitted). If they do so, the burden shifts back to the plaintiff, who must show that the defendants'

---

[5] The parties agree that the legal standards of Title VII and the NYSHRL are substantively identical. (*See* Defs.' Mot. at 4; Pl.'s Opp'n at 9–10).

8

"justification was pretextual or that her firing was motivated at least in part by [her] membership in a protected class." *Id.* (quotation omitted). In an employment discrimination case where "the merits turn on a dispute as to the employer's intent," the Second Circuit requires a cautious approach to an employer's summary judgment motion. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

Defendants seek summary judgment on three issues. First, they challenge Thomaidis's prima facie case on the ground that they are not the entities that employed and terminated her. Next, they turn to the second prong of the *McDonnell Douglas* analysis and submit that economic troubles and the need to downsize are non-discriminatory reasons for her termination. Finally, they argue that Thomaidis did not have any employment contract with the Defendants, and that her offer letter from Weltham Capital did not provide for medical benefits, so she cannot prevail on her breach of contract claim for the termination of her health insurance. The Court addresses each in turn and finds summary judgment inappropriate on each theory.

## I.    Thomaidis's Employment

Defendants first argue that Thomaidis was employed by Weltham Delaware and terminated solely by Abdalla on Weltham Delaware's behalf—so Weltham LLC and Weltham Capital cannot be liable for any misconduct. (Defs.' Mot. at 5–6, 9; Defs.' Reply at 8–11). They argue in the alternative that Weltham LLC should be dismissed because Weltham LLC and Weltham Capital cannot be considered a single employer, and Weltham LLC was not a joint employer of Thomaidis. (Defs.' Mot. at 12; Defs.'

9

Reply at 2–7).  There are sufficient factual disputes over both arguments to preclude summary judgment.

"[T]he existence of an employer-employee relationship is a primary element of Title VII claims."  *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006); *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022) ("The plausible existence of a requisite employer-employee relationship is thus a cornerstone of an adequately pled Title VII complaint.").  "[T]he Supreme Court culled the following non-exhaustive, thirteen-factor list of considerations" to guide in a court's determination of whether an entity is subject to Title VII liability:

> the hiring party's right to control the manner and means by which the product is accomplished . . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Gulino*, 460 F.3d at 371 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989)).  No single factor is determinative, but "the common-law element of control is the principal guidepost."  *Id.* (quotation omitted).

10

The test to determine NYSHRL employer status is substantially similar,[6] considering: "(1) the selection and engagement of the servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017) (quotation omitted). And it follows the Supreme Court in *Reid* and the Second Circuit in *Gulino*: "the right of control" is the "essential element of the relationship." *Id.* (quotation omitted).

A. **Weltham Capital**

Defendants generally contend that after Weltham Delaware was created, Thomaidis worked for that entity, and only Weltham Delaware employed her at the time of her termination. (Defs.' Mot. at 6). Defendants acknowledge that Weltham Capital employed Thomaidis at the start of her employment, but only then. (Defs.' 56.1 Stmt. ¶ 11 ("Plaintiff was technically started with Weltham Capital[.]"); *id.* ¶ 17 (noting that "Plaintiff was hired at Weltham Capital")). To that end, they acknowledge that Thomaidis received an offer letter from Weltham Capital, (*id.* ¶ 13; *see also* Weltham Capital Offer Letter, attached to Pl.'s Opp'n as Ex. 11, Dkt. No. 49-7), and admit that Thomaidis was a "client associate" for Weltham Capital, (Defs.' 56.1 Stmt. ¶ 14).

---

[6] Though the NYSHRL was amended in 2019 to also protect independent contractors, *see Franklin v. Whole Foods Mkt. Grp., Inc.*, No. 20-CV-4935, 2022 WL 256460, at *3 n.4 (S.D.N.Y. Jan. 26, 2022), the parties make no arguments that Thomaidis was a contractor. In addition, Defendants acknowledge there is no substantive difference in the Title VII and NYSHRL standards for employer status. (Defs.' Reply at 3).

Moreover, Thomaidis was also paid through Weltham Capital. (*Id.* ¶ 16; *see also* 2022 W-2, attached to Pl.'s Opp'n as Ex. 10, Dkt. No. 49-7).

But other than the single statement—in Defendants' Rule 56.1 Statement (but not in any supporting document)—that "Plaintiff was technically started with Weltham Capital . . . but she would work for Delaware Weltham when the business was up and running," (Defs.' 56.1 Stmt. ¶ 11), there is no evidence from which a jury could conclude that Thomaidis's employment was ever fully transitioned from Weltham Capital to Weltham Delaware. In Dadabhoy's testimony, describing the offer letter as ostensibly memorializing that Thomaidis was to join Weltham Capital "[u]ntil we transitioned to the Delaware," he appears to also admit that he does not know exactly when the transition occurred.[7] (Dep. of Imran Dadabhoy ("Dadabhoy Dep."), attached to Defs.' Mot. as Ex. D, Dkt. No. 49-3 at 95:19-25). And, in fact, the letter itself makes no mention of any such arrangement, and does not foretell the creation of Weltham Delaware, let alone mention it by name. (Weltham Capital Offer Letter).

In any event, Thomaidis has produced sufficient evidence to create a factual dispute on the question of whether Weltham Capital continued to employ her when the alleged discrimination took place, between January and May 2022. She produced her W-2 for the 2022 tax year, which lists Weltham Capital as her employer. (*See* 2022 W-2). Defendants have not offered a W-2 from any other entity for 2022 or any other document that evinces any other company paid or employed her.

---

[7] Unfortunately, the deposition excerpts provided do not include this complete conversation.

Thus, the offer letter, Defendants' admission that Weltham Capital employed Thomaidis and paid her, and documents evidencing her employment by that entity during the relevant period—with little to no evidence to the contrary—is more than sufficient for a jury to conclude it employed Thomaidis. And therefore it is sufficient to deny Weltham Capital's attempt at dismissal.

### B.     Weltham LLC

Employees are "not squarely limited" to Title VII claims against their *formal* employer—they may also hold a "constructive employer" liable pursuant to the "joint employer doctrine," *Felder*, 27 F.4th at 838, or the "single employer doctrine," *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016). Said differently, "[t]he joint employer doctrine, along with the 'single employer' (or 'single integrated employer') doctrines have been developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer." *Id.* (quotation omitted). The joint employer doctrine applies when "an employee, formally employed by one entity is assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity." *Felder*, 27 F.4th at 842 (quotation omitted). The test for a joint employer relationship is met "when two or more entities, according to common law principles, share significant control of the same employee." *Id.* at 843. In other words, it is met when "an entity other than the employee's formal employer has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities." *Id.* at 844.

The single employer doctrine applies to "an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity." *Griffin*, 835 F.3d at 292. "To determine whether two separate entities should be considered a single employer for the purposes of employment discrimination claims, courts have relied on four considerations: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Id.* No single element is dispositive; "[u]ltimately, single employer status is characterized by [the] absence of an arms[-]length relationship found among unintegrated entities." *Div. 1181 A.T.U. – N.Y. Emps. Pension Fund ex rel. Cordiello v. City of N.Y. Dep't of Educ.*, 910 F.3d 608, 617 (2d Cir. 2018) (quotation omitted).[8]

Defendants argue that, even if the Court finds that Weltham Capital employed Thomaidis, Weltham LLC was not a joint employer. (Defs.' Mot. at 12; Defs.' Reply at 2). Here, they argue that Weltham LLC never paid Thomaidis and had no control or supervision over her day-to-day operations—only Abdalla did, and Defendants appear

---

[8] In *Griffin*, the Second Circuit certified the question of whether the single and joint employer doctrines apply to the NYSHRL to the New York Court of Appeals. 835 F.3d at 294. The New York Court of Appeals did not resolve that question directly, but responded that New York common law governs the analysis of whether an entity is an employer for NYSHRL purposes. *Griffin*, 29 N.Y.3d at 186. In other words, the four enumerated factors (hiring, payment, the power to fire, and control over the employee's conduct) "determine who is an employer under the Human Rights Law," with the right of control over the employee as the "really essential element" of the analysis. *Id.*

to contend that Abdallah had no role in Weltham LLC.[9]  (Defs.' Mot. at 12).  Dadabhoy and Siddiqui, the shareholders/members of Weltham LLC, (Defs.' 56.1 Stmt. ¶ 4), testified that they did not know Thomaidis was hired or fired until Abdalla told them, that they never assigned Thomaidis work, and that they generally had no supervision over her, (Dadabhoy Dep. at 67:8-10, 68:2-6, 105:17-20; Dep. of Naveed Siddiqui ("Siddiqui Dep."), attached to Defs.' Reply as Ex. B, Dkt. No. 49-11 at 31:15-24).  Defendants also devote significant argument to the contention that Weltham LLC is purely a passive entity—it invests in and advises other businesses but does not otherwise acquire control over employees in its investment businesses.  (*See* Defs.' Reply at 4, 6).

But Thomaidis produced significant evidence disputing these characterizations.  She testified that she reported not only to Abdalla, but also to Dadabhoy and Siddiqui,

---

[9] Some of the exhibits Defendants cite to support their claim that Weltham LLC never hired, paid, or otherwise employed Thomaidis, were filed on the Court's docket "under seal," as was some evidence of Defendants' finances.  (*See* Decl. of Stephen M. Gengaro in Supp. of Defs.' Mot. ("Gengaro Decl."), Dkt. No. 49-2 at 2 nn.1–4; Exs. E, G, H, K, attached to Defs.' Mot., Dkt. Nos. 49-4, 49-5; *see also* Defs.' 56.1 Stmt. ¶¶ 9–10, 12–13, 24, 29 (citing these exhibits)).  But Defendants never moved to file any documents under seal.  Two of the documents, marked as Defendants' Exhibits E and G— Thomaidis's offer letter and her 2022 W-2, respectively, were apparently redacted because they were marked confidential by Thomaidis in discovery.  (Gengaro Decl. at 2 nn.1–2).  But those same documents were filed publicly by Thomaidis as Exhibits 10 and 11 to her opposition.  The other two, marked as Defendants' Exhibits H and K— Weltham Capital's financial records and a letter confirming closure of a bank account, respectively—were apparently sealed because they were marked "Attorneys Eyes Only" by Defendants in discovery.  (*Id.* at 2 nn.3–4).  Thomaidis also filed the account closure letter publicly as Exhibit 6 to her opposition, with the account number redacted.  Having failed to abide by the Court's rules for sealing, *see* Individual Practices § III(G), and without any attempt to justify sealing of judicial documents, these documents must be filed on the public docket.

the only two members/investors of Weltham LLC, and regularly had meetings with all three.  (*See* Pl.'s 56.1 Stmt. ¶ 8; Dep. of Lianna Thomaidis ("Thomaidis Dep."), attached to Pl.'s Opp'n as Ex. 1, Dkt. No. 49-7 at 20:6-11).  She would email Dadabhoy and Siddiqui almost daily.  (*Id.* at 21:20-24, 22:12-20).  She testified that she could not tell under which particular company she was supposedly working, because "they were intertwined."  (*Id.* at 29:19–30:15 ("I was working under the three of them throughout the duration that I was there.  So, again, I'm not sure of the right exact company but we were doing business under Weltham Capital but also e-mailing clients and everything through Weltham [LLC].");  *id.* at 64:8-11 ("[M]y e-mail was Weltham.com instead of Weltham Capital.  I was reporting to [Dadabhoy] and [Siddiqui] who were Weltham [LLC] as well as [Abdalla.]")).

She submitted text messages that show Abdalla asking her to send reports on leads and marketing activities to Siddiqui, (Text Messages, attached to Pl.'s Opp'n as Ex. 4, Dkt. No. 49-7 at 55),[10] and letting her know that Dadabhoy was working on her employment contract and payroll, (*id.* at 59).  She submitted emails further supporting their employment relationship: in May and June of 2021, she emailed Dadabhoy asking him to order a keyboard and mouse for her and for permission to get a PDF editor subscription, (Emails, attached to Pl.'s Opp'n as Ex. 5, Dkt. No. 49-7 at 77–78); on July 6, 2021, Dadabhoy emailed Abdalla that they "should have Lianna pull this report and have it reviewed daily" and that "[s]he can subsequently update the pipeline to reflect

---

[10] Page numbers cited with respect to the text message and email exhibits refer to ECF pagination.

credit activity," (*id.* at 81); on October 15, 2021, Dadabhoy emailed a payroll service stating, "[w]e would like to add $ 150 bonus to Lianna's next pay cycle," (*id.* at 67); on January 24, 2022, Dadabhoy was the one to send Thomaidis her 2021 W-2, (*id.* at 68).

As to whether Weltham LLC was directly involved in the allegedly discriminatory conduct at issue, Thomaidis submitted multiple emails between Abdalla, Dadabhoy, and Siddiqui, discussing what to do about her "concerns" related to maternity leave in April of 2022, (*id.* at 82)—before she was let go—and whether any one of the three of them had "set expectations" with her the following month, (*id.* at 84).

The evidence above demonstrates that a jury could well conclude that Weltham LLC—in addition to Weltham Capital—had power over Thomaidis's pay, benefits, termination, and daily tasks. And as a result, even if Weltham Capital was formally her employer, Weltham LLC could also be deemed responsible as a joint employer. *See, e.g., Torres v. Brend Restoration Servs. Inc.*, No. 22-CV-1191, 2024 WL 4355030, at \*5 (S.D.N.Y. Sep. 30, 2024) ("Because 'the greatest emphasis should be placed . . . on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks,' the existence of genuine disputes of material facts on this factor alone is likely sufficient to foreclose summary judgment for Defendants." (quoting *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000))); *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 362 (E.D.N.Y. 2023) (finding that a factual dispute over whether Defendant was a joint employer precluded summary judgment).

17

Similarly, the evidence would permit a jury to conclude that Weltham LLC and Weltham Capital are so intertwined that they should be considered a single employer—since Dadabhoy and Siddiqui, who control Weltham LLC, appear to have significantly intermingled operations with and control over Weltham Capital.[11] *See Nat'l Lab. Rels. Bd. v. Newark Elec. Corp.*, 14 F.4th 152, 165 (2d Cir. 2021) (finding the single employer doctrine satisfied where entities had common, though not coextensive, ownership, shared office and warehouse space, and employees serving the same customers, among other factors).  Thomaidis submitted evidence from Weltham LLC's website, which lists it having the same Costa Mesa, California address as Weltham Capital.  (*See* Pl.'s Opp'n at 6–8; *compare* Weltham LLC Website, attached to Pl.'s Opp'n as Ex. 13, Dkt. No. 49-7, *with* 2022 W-2).  That fact alone—along with the absence of any evidence that Weltham LLC was run out of a different space or that its daily operations were actually divided in any appreciable way—is a basis to infer interrelated operations and conclude both acted as a single employer.  *See Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 261–63 (E.D.N.Y. 2012) (finding operations interrelated in light of, *inter alia*, coordination in billing, shared office space, similar business purposes, and centralized control of labor relations in light of the use of the other entity's employees with "at least some regularity," and concluding single employer present (quotation omitted)).  And, of course, there is Defendants' own claim that Weltham LLC owns Weltham Capital.

---

[11] Defendants also submitted excerpts of Dadabhoy's deposition testimony in which it appears he (and possibly Siddiqui and Weltham LLC) had a more active role in Weltham Capital than their briefs suggest.  (Dadabhoy Dep. at 29:19-21 ("That was how we had started the company.  Weltham Capital [ ] is what we started, and then it transferred to Weltham Delaware.")).

(Defs.' 56.1 Stmt. ¶ 5); *see Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P Concrete Co.*, No. 19-CV-2145, 2023 WL 3948751, at *8 (E.D.N.Y. June 12, 2023) (finding common ownership and control pointed to single employer status), *aff'd*, 145 F.4th 204 (2d Cir. 2025).

Thomaidis has adduced sufficient evidence to preclude Weltham LLC's motion for summary judgment.

## II.   Thomaidis's Discrimination and Retaliation Claims

Defendants next seek summary judgment on the basis of a legitimate, non-discriminatory reason for terminating Thomaidis: the business was failing.  (Defs.' Mot. at 6–7, 9; Defs.' Reply at 9).  Defendants point to the housing market downturn in 2022 and the fact that Weltham Capital and Weltham Delaware closed about eight months after Thomaidis was terminated, (Defs.' Mot. at 7), as well as Abdalla's contemporaneous suggestion to Thomaidis that he was having some difficulty getting the business off the ground, (Defs.' Reply at 10).

Accepting Defendants' proffered non-discriminatory justification, the presumption of discrimination or retaliation "drops from the picture," *Zann Kwan*, 737 F.3d at 845, and the burden shifts back to Thomaidis, who must show that explanation "was pretextual or that her firing was motivated at least in part by [her] membership in a protected class," *Knox*, 134 F.4th at 48; *see also Zann Kwan*, 737 F.3d at 845 (noting that plaintiff must prove retaliation was but-for cause of adverse action).  She can do so "by proving that an impermissible factor was a *motivating factor*, without proving that the employer's proffered explanation was not some part of the employer's motivation," and

19

need not prove the falsity of the proffered non-discriminatory reason. *Bart*, 96 F.4th at

570 (quotation omitted)).  And that is accomplished, for example, "by demonstrating

weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

proffered legitimate, nonretaliatory reasons for its action," from which "a reasonable

juror could conclude that the explanations were a pretext for a prohibited reason."

*Zann Kwan*, 737 F.3d at 846.  Thomaidis has identified sufficient deficiencies to permit

her pregnancy discrimination and retaliation claims to survive summary judgment.

   Thomaidis's evidence that Abdalla told her he was hiring two new people while

terminating her for financial reasons suggests that the proffered inability to pay is false.

(Pl.'s Opp'n at 12; Thomaidis Dep. at 126:17-21).[12]  And she notes that the businesses did

not shut down for eight months following her termination—meaning the economic

considerations played little to no role in her termination.  (Pl.'s Opp'n at 12).[13]

---

[12] Thomaidis produced an audio recording of the phone call in which Abdalla informed her of her termination.  (Audio Recording, attached to Pl.'s Opp'n as Ex. 9, Dkt. Nos. 49-9, 51).  Abdalla explained on that call that the new hires would be originators that would "process their own deals," (*id.* at 00:15–00:29), i.e., generate their own salaries, which Defendants rely on to show the economic justification for terminating Thomaidis and hiring revenue-neutral employees.  (Defs.' Reply at 10).  But the recording creates some tension with the lawyers' account: Abdalla explains that the company would "have to spend money for marketing, and that's what we're going to do for them."  (Audio Recording at 00:20–00:25).  And whether the employees were actually hired or not—Defendants dispute that they were—does nothing to undermine the inference of pretext.  A jury could conclude that an employer who tells an employee they are firing her because they have no ability to pay her and are downsizing, but in the same breath mentions the hiring of two new employees, was not telling the truth.

[13] Indeed, Abdalla gave Thomaidis no indication that the businesses were even considering winding down.  To the contrary, he says "maybe there's an opportunity for us to bring you back on board" after the two new hires get "up and going."  (Audio Recording at 02:07–02:12).

Quite separately, the temporal proximity between her multiple requests for information on maternity leave and her termination is sufficient for a jury to conclude that the Defendants' proffered reasons were false. (*Id.*). After several weeks of emails between Thomaidis, Abdalla, Dadabhoy, and Siddiqui about a maternity leave policy in April 2022 with no substantive response, Thomaidis emailed all three of them on May 9, 2022 to inquire again. (Pl.'s Counterstatement of Material Facts ("Pl.'s 56.1 Counterstatement"), Dkt. No. 49-6 ¶ 33; Emails at 80, 82–83, 87). That same day and the next, Abdalla, Dadabhoy, and Siddiqui emailed with each other to ask whether "someone set expectations with [Thomaidis]." (Pl.'s 56.1 Counterstatement ¶¶ 34–37; Emails at 84–85). On May 27th, Abdalla told Thomaidis in the morning that he had "information on her maternity leave" and would call her in the afternoon. (Pl.'s 56.1 Counterstatement ¶ 38; Thomaidis Dep. at 113:3-5). And in that call, he terminated Thomaidis. (Pl.'s 56.1 Counterstatement ¶ 39; Thomaidis Dep. at 113:9-13). This temporal proximity, together with the weaknesses and implausibilities Thomaidis identifies with respect to the non-discriminatory justifications, are enough to defeat summary judgment. *See Zann Kwan*, 737 F.3d at 847 ("Kwan's evidence of Andalex's inconsistent explanations for her termination and the very close temporal proximity between her protected conduct and her termination are sufficient to create a triable issue of fact[.]"); *Knox*, 134 F.4th at 50 ("Knox also presented other evidence to support her argument that the employer's proffered reason for the termination was pretextual. . . . Combined with the temporal proximity between Knox's complaints and

21

her firing, this evidence would allow a rational jury to conclude that Clean Rite would not have fired her but for her protected activity.").

### III.     Breach of Employment Contract

Thomaidis's Complaint includes a separate breach of contract claim for the abrupt termination of her health insurance.  (Compl. ¶¶ 87–91).  Defendants argue she "does not have an employment contract with Weltham LLC or with Weltham Capital," and that the offer letter she signed "does not provide for any medical benefits."  (Defs.' Mot. at 10).  Thomaidis, however, proffers a different theory of liability: she seeks to enforce an oral agreement preceding that offer letter in which Abdalla promised her health benefits.  (Pl.'s Opp'n at 17).

"A breach of contract claim under New York law has four elements: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Up State Tower Co., LLC v. Town of Cheektowaga*, No. 24-0165, 2025 WL 444207, at *1 (2d Cir. Feb. 10, 2025) (quotation omitted).  "Under New York law, parties are free to bind themselves orally[.]"  *Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997).  To determine the enforceability of an oral contract, the "*Winston* factors" govern: "[t]he court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Acun v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 852 F. App'x 552, 554 (2d Cir.

2021) (quoting *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)).  "No single factor is decisive, but each provides significant guidance."  *Id.* (quotation omitted).

Thomaidis is seeking to enforce a purported oral agreement with Defendants for health insurance.  (Pl.'s Opp'n at 17).  She testified that she had a phone call with Abdalla before she began working in which she was promised health insurance. (Thomaidis Dep. at 60:8-20).  And Thomaidis did in fact receive health insurance for several months of her employment—she was issued an insurance card effective August 1, 2021, before her coverage was terminated in November of 2021 without notice.  (Pl.'s Opp'n at 17; Insurance Card, attached to Pl.'s Opp'n as Ex. 8, Dkt. No. 49-7; Pl.'s 56.1 Counterstatement ¶ 20).  As further evidence of the oral contract, she relies on an unexecuted agreement: an offer letter dated April 27, 2021, on Avolar letterhead, that invites acceptance by signing and returning via email by May 3, 2021, and which provides that Thomaidis is eligible for a "private health and dental insurance plan." (Avolar Offer Letter, attached to Pl.'s Opp'n as Ex. 12, Dkt. No. 49-7).  That Avolar "offer" letter was provided to evidence Thomaidis's employment in support of her mortgage application.  (Thomaidis Dep. at 46:16-25).

Defendants do not directly contest Thomaidis's oral contract theory.[14]  Instead, they argue that Thomaidis had no "employment contract" with Weltham LLC or

---

[14] The only argument Defendants make challenging the enforceability of the oral agreement is the uncontroversial statement that if parties do not intend to be bound until their agreement is reduced to writing and signed, their oral agreement is not enforceable.  (Defs.' Reply at 12 (citing *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, 257 F. Supp. 2d 768, 774 (S.D.N.Y. 2003))).  But to evaluate the parties' intent to be bound by their oral agreement, the Court must look to the *Winston* factors—none of which are briefed or even mentioned by Defendants.  *See Cary Oil Co.*, 257 F. Supp. 2d at 774.

Weltham Capital.  Of course, as noted, she did have a written contract with Weltham Capital.[15]  True, the offer letter dated April 25, 2021, from Weltham Capital and signed by Thomaidis on April 26, 2021, does not mention health insurance.  (Weltham Capital Offer Letter).  But Thomaidis is not attempting to enforce that employment agreement.  (Pl.'s Opp'n at 17 ("Although medical benefits were not explicitly written on the employment offer, Plaintiff had spoken to Abdalla, who promised to provide health insurance as part of her benefits working for Defendants.")).  And ultimately, the question of on behalf of which Weltham entity Abdalla was speaking is a disputed issue of fact.  For the same reasons Defendants cannot dismiss one or more Weltham entities from the suit for Title VII or NYSHRL purposes—since the facts suggest one, any, or all of them employed Thomaidis, *supra* pp. 11–19—they cannot remove them from potential contractual liability.

To the extent Defendants separately contend that Thomaidis's signed offer letter is the governing agreement and does not indicate any entitlement to medical benefits, so she cannot maintain any claim for termination of her insurance, (Defs.' Mot. at 11; Defs.' Reply at 12–13), that letter contains no merger clause and does not say that it supersedes, replaces, or otherwise countermands any prior oral or written agreement between the parties.[16]  *See Bloomfield Inv. Res. Corp. v. Daniloff*, No. 23-0934, 2024 WL

---

[15] Defendants also make no argument that they cannot be held liable as single or joint employers on Thomaidis's breach of contract claim.

[16] The offer letter also expressly leaves some benefits to be determined. (Weltham Capital Offer Letter ("You will be eligible for [ ] incentives based on production milestones (TBD).")).

3517850, at *2 (2d Cir. July 24, 2024) ("[T]he fact that the Subscription Agreement lacked a merger or integration clause further invites examination of extrinsic evidence to prove the nature of [the parties'] mutual promises." (quotation omitted)).  In other words, Thomaidis could still enforce the oral agreement, even in the face of the written contract, since here the latter does not preclude the former.  *E.g.*, *Cestari v. Bancorp, Inc.*, 364 F. Supp. 3d 327, 336–37 (S.D.N.Y. 2019) (finding that verbal compensation agreements might be enforceable because the written employment contract did not preclude the plaintiff from entering into additional agreements, and determining that the issue should be left to the jury).

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is denied.  The parties are directed to submit a joint pretrial order consistent with the undersigned's Individual Practices by **April 23, 2026**.

SO ORDERED.
*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:  March 24, 2026
        Central Islip, New York

25